**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ERNEST DEWAYNE JONES, *Petitioner-Appellee*, v. RONALD DAVIS, Warden, *Respondent-Appellant.* | No. 18-99003 D.C. No. 2:09-cv-02158-CJC OPINION |

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted April 20, 2021
Pasadena, California

Filed August 12, 2021

Before:  Jay S. Bybee, Michelle T. Friedland, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Friedland

## SUMMARY[*]

### Habeas Corpus / Death Penalty

In a case in which Ernest Jones was convicted and sentenced to death for the murder of his girlfriend's mother, the panel reversed the district court's order granting relief on one claim in Jones's 28 U.S.C. § 2254 habeas corpus petition, and remanded for the district court to consider Jones's remaining claims.

The district court granted relief on Jones's claim that the state trial court violated his right to present a complete defense. Specifically, the district court held that Jones should have been permitted to testify during the guilt phase about events from his childhood and his mental health history, and that the trial court had erred by conditioning such testimony on the presentation of a psychiatric expert who would explain the testimony's relevance to Jones's mental state during the murder.

Reviewing de novo, the panel held that the condition the trial court imposed on Jones's testimony was neither arbitrary nor disproportionate to the valid purposes served by its ruling.

### COUNSEL

Herbert S. Tetef (argued) and A. Scott Hayward, Deputy Attorneys General; James William Bilderback II,

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Supervising Deputy Attorney General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the Attorney General, Los Angeles, California; for Respondent-Appellant.

Nisha K. Shah (argued) and Cliona Plunkett, Habeas Corpus Resource Center, San Francisco, California, for Petitioner-Appellee.

## OPINION

FRIEDLAND, Circuit Judge:

In 1995, Ernest Jones was convicted and sentenced to death for the murder of his girlfriend's mother. After the California Supreme Court affirmed his conviction and sentence and denied his state habeas petition, Jones filed a federal habeas petition, raising multiple challenges to both the guilt and penalty phases of his trial. The district court granted relief on Jones's claim that the state trial court violated his right to present a complete defense. Specifically, the district court held that Jones should have been permitted to testify during the guilt phase about events from his childhood and his mental health history, and that the trial court had erred by conditioning such testimony on the presentation of a psychiatric expert who would explain the testimony's relevance to Jones's mental state during the murder. Reviewing de novo, we hold that the condition the trial court imposed on Jones's testimony was neither arbitrary nor disproportionate to the valid purposes served by its ruling. Accordingly, we reverse and remand for the district court to consider Jones's remaining claims.

I.

A.

Shortly after midnight on August 25, 1992, Chester Miller returned home from work and noticed that his and his wife's car was missing from their driveway.[1]  He entered the house and found his wife, Julia Miller, dead on the floor of their bedroom.[2]  Miller was gagged, bound by her arms and legs, and naked from the waist down.  She had sustained at least sixteen stab wounds.  The fatal wound was a stab to her chest that perforated her aorta.  Medical examiners later found semen in Miller's body that matched Jones's DNA.  According to the examiners, the semen had entered her body within five to ten hours of her death.

At around 1:00 a.m., Miller's daughter, Pam, heard the doorbell of her apartment ring.  Her grandparents had come to inform her of her mother's death.  Pam asked Jones, with whom she lived, to accompany her to her grandparents' house; Jones told her that he would join her if he could get his sister's car.  Pam then called her friend Shamaine, who lived near Pam's parents' house.  Shamaine told Pam over the phone that Jones had come to her house earlier that evening to exchange jewelry for drugs.  She urged Pam to come look at that jewelry.  Pam did so and immediately recognized the jewelry as Miller's.  She realized then that Jones had killed her mother.

---

[1] We provide the facts as presented at trial, drawing from the trial and state habeas records.

[2] For clarity, we refer to Julia Miller by her last name and to her daughter, Pam Miller, by her first name.  We also refer to certain witnesses by their first names to protect their privacy.

Pam returned with several police officers to her and Jones's apartment to find it empty and the front and back doors barricaded with furniture.  Officers later discovered Miller's station wagon parked near the apartment and began surveilling it.  Sometime between 3:00 and 3:30 a.m., the officers saw Jones get into the car and drive off.  The officers followed him; a few minutes into the drive, Jones pulled a rifle from the back seat of the car to the front seat and began speeding.  A forty-minute pursuit ensued, during which Jones ignored red lights, ran stop signs, and blew out his left tires.  Eventually, the car became totally disabled and came to a stop.  Officers approached Jones and ordered him to exit the car, but he remained inside and shot himself in the chest with the rifle.  Jones was hospitalized but survived.

B.

1.

Jones was tried on charges of first-degree murder, rape, robbery, and burglary.  The State's theory at trial was that Jones had deliberately raped and killed Miller; stolen her jewelry, rifle, and car; and exchanged her jewelry for drugs after the murder.  The State also sought to prove the special circumstance that Jones murdered Miller "in the commission of" a rape, robbery, or burglary—meaning that he murdered her while committing or attempting to commit one or more of those crimes, and that he murdered her to "carry out or advance the commission of" such a crime, to "facilitate the escape" from such a crime, or to "avoid detection" for such a crime.  Only if the jury found true this special circumstance would Jones be eligible for the death penalty.  Cal. Penal Code § 190.2(a)(17)(A), (C), (G).  Jones did not deny that he raped and murdered Miller; he asserted only that he lacked the specific intent to do so because he blacked out right before those crimes.

To help prove Jones's intent, the State introduced evidence of a similar past crime.  In 1985, Jones had raped a woman named Doretha, who was the mother of Jones's ex-girlfriend, Glynnis.  At the Miller murder trial, Doretha testified that Jones had broken into her home, tied her up, and raped and sodomized her.  She recounted how, after Jones's assault ended, he lay down on her bed and rested while she was still restrained.  Sometime later, while still at Doretha's house, Jones had an emotional reaction to a photograph of himself with Glynnis and their infant son.  He told Doretha he would allow her to live for his son's sake; then, he pointed a knife to his stomach and asked Doretha to kill him instead.  Doretha refused, and Jones left her tied to the bed after taking money from her purse.

Jones testified in his own defense during the guilt phase of the Miller murder trial.  On the stand, Jones admitted that everything Doretha had previously testified to was true, even if he could not remember all the events she described.  He explained that he had been angry at Glynnis for breaking off their relationship, and that he had been looking for Glynnis when he broke into Doretha's home, but then "directed [his] anger at" Doretha.

Jones also recounted his version of the events surrounding Miller's murder.  Jones testified that, on the day in question, he had turned to drugs for the first time since getting out of prison because he learned that Pam was having an affair.  He purchased rock cocaine and marijuana from Shamaine that afternoon, paying in cash.  After smoking, Jones became "very high" and "very paranoid."  He stated that when Pam came home that evening, she gave Jones some jewelry to exchange for more drugs.  Jones testified that, at the time, he did not recognize the jewelry as belonging to Miller.  Jones bought a second batch of drugs

from Shamaine with the jewelry around 7:30 p.m.   He became nervous about being approached by police while waiting for the bus home, so he decided to walk to Miller's house to ask for a ride.

Miller let him in.   Although their interaction started cordially, she soon asked Jones how he had broken his thumb, which was in a cast.   Jones admitted that he had injured it while grabbing Pam during an argument.   Miller immediately became angry and took a knife out of a kitchen drawer.   Jones grabbed another knife in response and the two began to physically fight.   Miller ran to her bedroom and retrieved a rifle, but Jones knocked her down and she dropped it.   As Jones was standing over Miller, she said, "Give it to me."

It was at this moment that Jones "slipped back into [his] childhood."   Jones testified:

> In my mind, I was visioning when I was little, when I walked into a room with my mother who was with another man that wasn't my father, and I bent down, grabbed the knife off the floor, and I remember grabbing a rag or a cloth or something, and I picked up the knife and I started to stab [Miller].

Jones testified that the next thing he remembered was "being curled up in a ball crying, and [he] looked over at Ms. Miller and she was lying there tied up and she was dead."   Realizing what he had done, Jones took a second rifle that was in the bedroom and left in Miller's car, intending to commit suicide.   As he left, he started hearing voices saying, "They're going to kill you."   Jones asserted that he had had no intention of harming Miller when he entered her house.

Jones testified that he continued to experience paranoia and hear voices on the way home.  When Pam left with her grandparents later that night, Jones barricaded himself in the apartment.  Sometime between 3:00 and 3:30 a.m., he left the apartment, taking Miller's car and planning to drive off a nearby cliff.  He saw police pursuing him and again heard voices saying, "They're going to kill you."  The chase ended when the car became disabled.  Continuing to hear the voices, he shot himself in the chest with the Millers' rifle as the officers approached.

2.

During the guilt phase of the trial, defense counsel repeatedly sought to introduce evidence of Jones's traumatic childhood and prior mental health symptoms—specifically, his history of hearing voices, blacking out, and experiencing flashbacks.

The issue first arose when defense counsel asked Jones, while he was on the stand, whether he had received psychiatric treatment while in prison for the crimes against Doretha.  The prosecution objected, arguing at a subsequent sidebar hearing that such testimony had no bearing on Jones's specific intent to rape and murder Miller years later absent a psychiatrist explaining its relevance or offering a diagnosis.  Defense counsel countered that Jones was competent to testify without an expert about his own symptoms and treatment history as long as that testimony fell short of a diagnosis, and that Jones's lack of treatment would help explain his crimes as triggered by unaddressed mental health problems.  He also noted his intention to ask Jones "about his background . . . his family problems, [and] the past times when he heard voices."

The trial court precluded Jones from testifying about his childhood or past treatment history without expert psychiatric testimony accompanying it.   The court did, however, allow: (1) testimony that Jones was currently taking medication that "ma[d]e him feel better," to explain his demeanor on the stand; and (2) testimony that Jones had been attending counseling in the months leading up to the Miller murder in 1992.   Accordingly, the jury heard that Jones was receiving medication in jail, which a jail physician later identified as anti-depressive and anti-psychotic medications, and that Jones had met with a psychiatrist in 1992 on the orders of his parole officer, a process that Jones described as simply "going through the motions."

Defense counsel revisited the court's evidentiary ruling during a break in Jones's cross-examination.   Noting that state jury instructions did not prohibit the jury from considering evidence of mental disease without expert testimony, counsel offered a detailed proffer of the testimony he hoped to elicit from Jones about his abusive childhood; his family history of mental health issues; his witnessing his mother's infidelity; his past "dizzy spells, black outs, [and] hearing voices"; and other events that "all led to the explosion" on the night of the murder.[3]   In

---

[3] Counsel's full proffer was as follows:

The problems at school.  He was in special education. Attended many schools. . . .

Drug use; marijuana at 15, alcohol at 15; cocaine about 25 times; some evidence of LSD; family history of mental disease; Aunt Jackie shot herself to death; grandfather had delusions, ran down the street with a

response, the prosecution again contended that the jury would be unable to understand the relevance of such testimony to Jones's lack of specific intent without "a psychiatrist taking all these symptoms and linking them together and giving us a diagnosis." The prosecution observed that the court had appointed an expert psychiatrist for this very purpose, who had already written a report on Jones's mental state and who was available to testify for the defense. The trial court asked defense counsel if he intended to call an expert psychiatrist. When counsel answered that it was not his "present intention" to do so and that he

gun; and a cousin and a son on Ritalin for A.D.D., attention deficit disorder.

No food; no electricity many times because the family was spending the money on alcohol; both parents were alcoholics; a series of beatings with extension cords; brother who was killed, and the defendant saw the brother in the street; a mother who was promiscuous.

And I believe the defendant already testified to, when he was about seven or eight, opening the door and seeing [his mother] in bed with another man.

Other incidents of other men, dizzy spells, black outs, hearing voices, screaming at night—this is all the defendant—and also being told by his mother that she did not believe that his father—his father was not really his father.

Also the fact that he was afraid to discuss his problems with others because he felt cut off already, and he felt that this would make him more cut off.

And then the incidents which even the D.A. wants to get into, the incidents with both Glynnis and Pam, and particularly Pam's mother; the drug use which all led to the explosion.

"want[ed] to see the rest of Mr. Jones' testimony" before deciding, the court again precluded Jones from testifying about his childhood and past symptoms and denied defense counsel's motion for a mistrial on this basis.

The issue arose a third time in the wake of a question the prosecution had asked Jones during cross-examination: whether he had been "trying to kill [his] mother" when he murdered Miller.  Jones had responded only that he did not "remember much."   On redirect, defense counsel asked Jones about his relationship with his mother in an effort to ameliorate the impact of that question.  After the trial court sustained the prosecution's objection, defense counsel argued once more that the court's earlier ruling was preventing Jones from establishing his credibility in the face of the prosecution's "disbelieving" and "dramatic" questioning.  Unpersuaded, the court reaffirmed its ruling and denied counsel's second motion for a mistrial.

In his closing argument, the prosecution highlighted the dearth of evidence supporting Jones's defense that he lacked specific intent, asking the jury, "What evidence is there here of a mental disorder other than the defendant saying I flashed back to my childhood?" and positing that Jones "only blacks out the times that . . . he has no other explanation for." Defense counsel renewed his motion for a mistrial based on these statements, which the trial court again denied.   The court did, however, instruct the jury that it could consider evidence regarding "a mental disorder . . . for the purpose of determining whether [Jones] actually formed the required specific intent."

After deliberating for several days, the jury found Jones guilty of first-degree murder[4] and rape.  It also found true the special circumstance that the murder was committed in the commission of a rape, making Jones eligible for the death penalty.  Cal. Penal Code § 190.2(a)(17)(C).  The jury acquitted Jones of the robbery and burglary charges.

C.

Although Jones was prevented from testifying about his childhood and past mental health symptoms during the guilt phase, other witnesses offered testimony on those subjects during the penalty phase.  Jones's childhood was, according to his aunt, "a living hell."  Multiple family members testified that Jones's parents drank heavily, were physically abusive to each other and their children, and sometimes left Jones and his siblings hungry.  According to Jones's aunt, Jones had once asked about the possibility of his father not being his biological father; he also suffered from screaming nightmares but would become withdrawn when asked about them.  Jones's sister testified that their brother was murdered when Jones was younger and that Jones had witnessed his body lying in the street afterwards—an experience after which Jones "was not the same person."  And Jones's father recounted that he arrived home one night to find his wife in bed with another man and a young Jones awake in the bed.

A family friend named Kim also appeared as a prosecution witness during the penalty phase.  She testified

---

[4] The verdict did not specify on which theory the jury found Jones guilty of first-degree murder: that the murder was committed with "the specific intent to kill which is premeditated and deliberate"; or that it was committed with "the specific intent to commit" rape (*i.e.*, felony murder).  *See People v. Jones*, 64 P.3d 762, 779 (Cal. 2003) (discussing the two possible theories underlying the murder verdict).

that in 1984—when Jones was about twenty and she was about twenty-three—he had raped her after they left a party together. But during the rape, she recounted, Jones seemed to take "on a new person, like he was in a trance, and then afterwards, he seemed to snap back." Jones was, in that moment, "an entirely different person than the person [she] knew." Kim successfully requested that the charges against Jones be dropped after the incident, but she asked for Jones to receive psychiatric treatment because she thought he needed help.

Jones's court-appointed expert psychiatrist, Dr. Claudewell Thomas, was the final penalty-phase witness. Based on previous physicians' reports on Jones and his own interviews of Jones, Dr. Thomas diagnosed Jones with schizoaffective schizophrenia: a disorder "characterized by psychotic responses" that could occur in "an intermittent and unpredictable pattern" in which "an individual's customary reality-oriented judgment is disrupted." According to Dr. Thomas, when Jones experienced "high emotionality" such as "rage," he underwent "an altered state of personality" and lost "the ability to control the normal functioning self." When Jones lost that control, Dr. Thomas continued, he entered an "inner reality" of the world "when he was growing up and subjected to the sadistic punishment of a domineering and promiscuous and alcoholic mother." Dr. Thomas opined that Jones's "destructive" childhood—including witnessing his mother's affair—contributed to the development of his disorder.

Based on this diagnosis, Dr. Thomas concluded that Jones had dissociated before raping Kim, Doretha, and Miller. The true object of Jones's assaults on Doretha and Miller, Dr. Thomas further opined, was Jones's mother.

Jones's account that he heard voices immediately after the Miller murder was another indication that his schizophrenia had influenced his thoughts and behavior.

The jury fixed the penalty at death. Defense counsel moved for a new trial, based in part on the trial court's earlier rulings limiting Jones's testimony. The court denied the motion, explaining that it had allowed Jones to testify freely about "what he was thinking or feeling or sensing at the time of the incident," but that counsel's proffer had provided "no nexus . . . to show the relevance of [the evidence] in the guilt phase." The court also expressed its view that counsel's decision not to call Dr. Thomas at the guilt phase was "a tactical decision," and one that the court understood after hearing Dr. Thomas's penalty-phase testimony. Jones was sentenced to death on April 7, 1995.

D.

On direct appeal before the California Supreme Court, Jones argued, as relevant here, that the trial court violated his right to present a complete defense by barring him from testifying about his "extensive history of hearing voices, flashbacks, and blackouts." Specifically, he contended that the trial court's ruling ran afoul of the constitutional requirement, established in *Rock v. Arkansas*, 483 U.S. 44 (1987), that restrictions on a criminal defendant's right to testify may not be arbitrary or disproportionate to the purposes those restrictions are meant to serve, *id.* at 55–56. Jones explained that the excluded testimony was "relevant to his ability or inability to form the specific intent to rape" and to the credibility of his admitted testimony that he flashed back and blacked out right before murdering Miller.

The California Supreme Court rejected this argument and affirmed Jones's conviction and sentence. *People v.*

*Jones*, 64 P.3d 762, 777, 787 (Cal. 2003).  Observing that Jones had testified that he heard voices only after raping and murdering Miller, the court held that "any prior history of hearing voices would not have been relevant" to his specific intent to rape her.  *Id.* at 777.  The court accordingly held that "[t]here was no error" in the trial court's rulings on the issue.  *Id.*  There was no mention of Jones's proposed testimony regarding flashbacks and blackouts, or of whether that evidence would have been relevant to Jones's intent. The court also concluded that any error was harmless because Dr. Thomas had not mentioned Jones's history of flashbacks and blackouts in his penalty phase testimony—an omission that the court took to suggest that any such testimony by Jones would have been a "recent fabrication." *Id*.

The United States Supreme Court denied certiorari. *Jones v. California*, 540 U.S. 952 (2003).  The California Supreme Court denied Jones's state habeas petition in 2009. Order, *In re Jones*, No. S110791 (Cal. Mar. 16, 2009).

Jones then filed a habeas petition in federal district court in which he, *inter alia*, challenged the exclusion of testimony about his childhood and mental health history.  The district court granted habeas relief on one of Jones's other claims, but that ruling was reversed on appeal by our court.[5] Following our remand, the district court then granted relief on Jones's *Rock* claim.  Observing that "Jones's testimony

---

[5] The district court had granted relief on Jones's claim that California's post-conviction review process creates such a delay between sentencing and execution that any executions that do occur are arbitrary in violation of the Eighth Amendment.  We reversed on the ground that Jones's claim was barred by *Teague v. Lane*, 489 U.S. 288 (1989), because it sought the benefit of a new constitutional rule. *Jones v. Davis*, 806 F.3d 538, 541 (9th Cir. 2015).

about his mental state was material, because his defense was
that he lacked the intent to murder or rape Ms. Miller as a
result of his mental disorder," the district court concluded
that Jones's right to testify in his own defense had been
violated and that the California Supreme Court's decision to
the contrary was an objectively unreasonable application of
*Rock* under 28 U.S.C. § 2254(d)(1).[6]   The district court
ordered that Jones either be released or granted a new trial.
The State timely appealed.

## II.

We review the district court's grant of habeas relief de
novo.  *Moses v. Payne*, 555 F.3d 742, 750 (9th Cir. 2009).
Because Jones's federal habeas petition was filed after April
24, 1996, it is governed by the Antiterrorism and Effective
Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d).
AEDPA precludes habeas relief on a claim that was
adjudicated on the merits in state court unless the court's
denial of the claim "resulted in a decision that was contrary
to, or involved an unreasonable application of, clearly
established Federal law, as determined by the Supreme
Court of the United States," or "resulted in a decision that
was based on an unreasonable determination of the facts in
light of the evidence presented in the State court
proceeding."   *Id.*   But we need not resolve whether
AEDPA's standards are satisfied if a petitioner's underlying

---

[6] The court denied another of Jones's claims, which challenged the
sufficiency of the evidence underlying the jury's rape-related findings,
as procedurally barred.  Jones did not appeal this decision.

constitutional claim fails even on de novo review. *See Fox v. Johnson*, 832 F.3d 978, 986 (9th Cir. 2016).[7]

### III.

We do not consider AEDPA's requirements here because Jones's constitutional claim fails on de novo review.[8]

### A.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations and quotation

---

[7] The parties agree that the California Supreme Court's denial of Jones's claim constituted an adjudication on the merits within the meaning of § 2254(d).

[8] After argument, we directed the parties to submit supplemental briefs discussing whether Jones's claim seeks the benefit of a new constitutional rule and is thus barred by *Teague v. Lane*, 489 U.S. 288 (1989). In his supplemental brief, Jones argues that the State failed to adequately raise *Teague* as an affirmative defense either in the district court or on appeal. *See Arredondo v. Ortiz*, 365 F.3d 778, 781–82 (9th Cir. 2004). We agree with Jones that the State failed to raise and preserve its *Teague* defense, and we therefore decline to address it sua sponte. *See Caspari v. Bohlen*, 510 U.S. 383, 389 (1994) (holding that a court "may . . . decline to apply *Teague*" when the state has not argued it); *Pensinger v. Chappell*, 787 F.3d 1014, 1024 (9th Cir. 2015) (declining to consider *Teague* sua sponte where, as here, the state "did not mention the defense" when responding to the relevant claim in its answer to the habeas petition before the district court, "even though it argued *Teague* as to several other claims in its answer," and where, as here, the state's appellate brief failed to adequately argue *Teague*).

marks omitted). This guarantee includes, "at a minimum, . . . the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). In many criminal cases, the "most important witness for the defense" in that determination of guilt "is the defendant himself." *Rock v. Arkansas*, 483 U.S. 44, 52 (1987).

Recognizing the critical role of a criminal defendant's own testimony, the Supreme Court held decades ago that "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 55–56. The Court has since explained that a defendant's right to present a complete defense is abridged by any restrictions on defense evidence that are "arbitrary or disproportionate" and that infringe on the defendant's "weighty interest." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

Under this framework, the restriction of a defendant's evidence pursuant to an evidentiary rule is arbitrary when applying the rule serves no legitimate purpose in the case at hand. For example, the Supreme Court has invalidated convictions resulting from trials that excluded evidence pursuant to "rules that . . . did not serve any legitimate interests." *Id.* at 325; *see also, e.g.*, *Holmes*, 547 U.S. at 331 (holding that a rule that categorically barred evidence of third-party guilt when strong forensic evidence of the defendant's guilt was presented "is arbitrary in the sense that it does not rationally serve the end that . . . [it was] designed to further" (quotation marks omitted)); *Rock*, 483 U.S. at 61 (holding that a rule that categorically barred all hypnotically refreshed testimony "is an arbitrary restriction . . . in the absence of clear evidence by the State repudiating the

validity of all posthypnosis recollections"); *Washington v. Texas*, 388 U.S. 14, 22 (1967) (holding that a statute that categorically barred accomplices from testifying for a defendant on trial for the same crime "cannot . . . be defended").   Exclusions of defense evidence may be arbitrary even when, "under other circumstances, [the rule] might serve some valid state purpose." *Chambers v. Mississippi*, 410 U.S. 284, 300 (1973) (holding that the application of the rule against hearsay to exclude exculpatory testimony violated the defendant's right to present a complete defense because the testimony was reliable).  And application of an evidentiary rule to preclude defense evidence, even when doing so "legitimately serve[s]" a "state's interest" in the case at hand, is disproportionate when it infringes excessively on a defendant's right to "tell his own story." *Greene v. Lambert*, 288 F.3d 1081, 1091 (9th Cir. 2002) (holding that the exclusion of all mention of the defendant's dissociative identity disorder violated *Rock*, notwithstanding the legitimate goal of ensuring reliable testimony).

That said, an individual's right to present a defense, either through his own testimony or through other evidence, is not without limit.   "The accused does not have an unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  A trial court therefore may, consistent with the Constitution, exclude defense evidence through the proper application of evidentiary rules that serve a valid purpose in a given case, including when proposed evidence is "only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Holmes*, 547 U.S. at 326–27 (alteration omitted) (quoting *Crane*, 476 U.S. at 689–90); *cf. Perry v. Rushen*, 713 F.2d 1447, 1453–54 (9th Cir. 1983) ("[T]here clearly is some

point at which evidence may be so lacking in probity and so productive of confusion that it may constitutionally be excluded.").

B.

Jones's right to present a complete defense was not violated because the trial court's evidentiary ruling was neither arbitrary nor disproportionate to the purpose that it served. The court explained its decision as "a matter of relevance": it concluded that expert contextualization was needed to provide a "nexus" between the events in Jones's past and his specific intent during the crimes. Ensuring that the jury would have understood the relevance of Jones's testimony and that Jones's testimony would not have confused the issues at trial was a proper and proportionate application of the standard rules of evidence to which the right to testify is always subject. *See Taylor*, 484 U.S. at 410; *Holmes*, 547 U.S. at 326; *cf., e.g.*, Cal. Evid. Code § 210 (defining relevant evidence); *id.* § 350 (providing that only relevant evidence is admissible); *id.* § 352 ("The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of . . . confusing the issues, or of misleading the jury.").

As a threshold matter, the trial court's challenged ruling is better described as imposing a condition than an absolute restriction. The record is clear that, had defense counsel planned to call an expert psychiatrist, the court would have permitted Jones to testify about his childhood and mental health history. We have previously considered the constitutionality of a condition on the admission of defense evidence in *Menendez v. Terhune*, 422 F.3d 1012 (9th Cir. 2005). There, the trial court prevented defendants who were on trial for murdering their parents from introducing third-

party testimony "that could explain why they feared their parents" without "first . . . lay[ing] a foundation" for that testimony by personally testifying "about their actual belief of imminent danger." *Id.* at 1030. We held that the state reviewing court acted reasonably in concluding that this condition did not violate the defendants' due process rights. *Id*. at 1031–32. *Menendez* did not hold, nor do we hold here, that a condition on the admission of defense evidence is immune from constitutional scrutiny. Still, the conditional nature of a ruling will often be relevant to whether it is arbitrary or disproportionate.

The trial court's condition on Jones's testimony was not arbitrary. Whether and how Jones's traumatic childhood and mental health history affected his ability to form specific intent years later were complicated questions. Counsel characterized the proposed testimony, which would have spanned the entirety of Jones's life, as describing a series of events that "all led to the explosion" culminating in Miller's murder. But at no point did counsel explain how Jones alone would have been able to draw that causal link for the jury. Nor would such a link necessarily have been apparent. The trial court therefore reasonably concluded that the relevance of Jones's proposed testimony required expert contextualization. *Cf. Smith v. McCormick*, 914 F.2d 1153, 1157 (9th Cir. 1990) (describing the expert's role in "understanding . . . the defendant's mental history, and explain[ing] to the jury how" such history is "relevant to the defendant's mental condition" (quoting *United States v. Fazzini*, 871 F.2d 635, 637 (7th Cir. 1989))); *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) ("The jury did not, however, have the benefit of expert testimony to explain the ramifications of [childhood injuries and chemical exposure] on [the defendant's] behavior. Expert evidence is

necessary on such issues when lay people are unable to make a reasoned judgment alone.").

Nor was the trial court's condition disproportionate. Rather, it "was a measured means to serve an important purpose." *Williams v. Borg*, 139 F.3d 737, 740 (9th Cir. 1998). Unlike in *Rock*, there were no less drastic and "more traditional means" available to explain to the jury the relevance of Jones's proposed testimony. *Rock*, 483 U.S. at 61 (discussing the alternative option of cross-examination to ensure reliability). And the court imposed its condition only on evidence whose relevance it reasonably worried would not have been apparent without expert testimony. By contrast, the court admitted those parts of Jones's testimony that were clearly independently relevant, such as what Jones was thinking and feeling on the day of the murder, including the substantive content of his childhood flashback right before the crime. Accordingly, any impact of the court's ruling on Jones's right to tell his complete story was proportionate to the evidentiary purposes served here. *Cf. Greene*, 288 F.3d at 1091.[9]

We also place significant weight on the fact that the condition the court imposed was not onerous: an expert psychiatrist had already been appointed, had written a report, and was available to testify on Jones's behalf. *Cf. Williams*, 139 F.3d at 741 (observing that the defendant "had complete

---

[9] Jones also contends that telling the jurors that he previously experienced flashbacks, blackouts, and hearing voices would have made them more likely to believe his account that he blacked out right before murdering Miller. But even if so, it was reasonable for the court to conclude that the weak probative value of such testimony was outweighed by the risk of confusing the jury about which questions it had to answer to determine whether Jones had formed the requisite specific intent.

control over whether he could testify or not," because he could choose whether to satisfy the condition of submitting to cross-examination).  That Jones may have been compelled to make a difficult tactical decision about whether introducing Dr. Thomas at the guilt phase was worth the risk of prejudicial cross-examination does not mean that the consequences of the court's condition were disproportionate to the interests it served.  The "Constitution does not forbid every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights." *Portuondo v. Agard*, 529 U.S. 61, 70 (2000) (quoting *Jenkins v. Anderson*, 447 U.S. 231, 236 (1980)).

Jones's arguments to the contrary do not persuade us. First, Jones argues that the trial court's ruling was arbitrary because California law allows lay testimony about mental health conditions without accompanying expert testimony, and that therefore, the restriction served no legitimate interests. *See, e.g.*, *People v. DeSantis*, 831 P.2d 1210, 1228 (Cal. 1992) ("[T]here is no logical reason why qualified lay witnesses cannot give an opinion as to mental condition less than sanity or to similar cognitive difficulties." (citation and quotation marks omitted)).  A state rule that lay witnesses are competent to offer mental health opinions, however, does not dictate that *any* lay testimony about mental health will be admissible notwithstanding other evidentiary rules.  *Cf. United States v. Vallejo*, 237 F.3d 1008, 1015 (9th Cir. 2001) ("The particular facts of the case determine the relevancy of a piece of evidence.").  To illustrate this point, the properly admitted testimony in one case Jones cites, *People v. Townsel*, 368 P.3d 569 (Cal. 2016), consisted of lay opinions that a defendant was not intellectually disabled, which were offered to rebut the defense that intellectual disability prevented the defendant from forming specific intent.  *Id.*

at 589–91. Unlike Jones's proffer, the relevance of this testimony was apparent without additional evidence. *See id*. The state law principles Jones invokes do not prove that the trial court's ruling here—which was premised on a missing link between Jones's mental health history and his specific intent, rather than on Jones's competence to testify about that mental health history—was arbitrary. Indeed, state law supports the trial court's weighing the value of Jones's unaccompanied testimony against the risks of confusion it posed. *See* Cal. Evid. Code § 352.

Second, Jones's reliance on our opinion in *Greene* is misplaced. The defendant in *Greene* sexually assaulted his therapist. 288 F.3d at 1084–85. At trial, he contended that he suffered from dissociative identity disorder ("DID") and that an alternate personality was in control of his body during the assault. *Id.* The trial court barred "any mention of" DID, precluding expert testimony, witness testimony, and the defendant's own testimony. *Id.* at 1085. On habeas review, we relied on *Rock* to hold that this broad exclusion "impermissibly curtailed [Greene's] right to . . . describe his state of mind at the time of the attack." *Id.* at 1091. We reached this conclusion notwithstanding the fact that the court's preclusion "legitimately serve[d]" the "state's interest in preventing unreliable or confusing scientific testimony." *Id.*

*Greene* is distinguishable because the type of evidence excluded there—the defendant's description of "his own state of mind at the time of the attack," *id.* at 1092—was admitted here. Jones testified that right before the murder, he flashed back to a moment from his childhood and blacked out shortly after. Moreover, the trial court did not condition Greene's DID testimony on the introduction of an expert;

rather, it flatly excluded all DID evidence, *including* that offered by his expert. *Id.* at 1085.

Indeed, in *Greene*, we anticipated evidentiary rulings like the one Jones challenges here, observing that our holding "may have the consequence of requiring expert testimony to provide context for the finder of fact." *Id.* at 1093. This statement strongly suggests that it is constitutional to require expert testimony to accompany lay testimony about mental health symptoms that is offered to disprove specific intent. Jones attempts to explain away this statement as stemming from the fact that the trial in *Greene* took place in Washington, which, unlike California, has a rule mandating expert testimony whenever scientific evidence is admitted. But whether a particular evidentiary ruling is dictated by state law has little bearing on whether it would comport with federal constitutional law. *See Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991). Our suggestion in *Greene* that such a requirement would be constitutional under *Rock* thus supports the State's position here regardless of variations in state law.

Ultimately, what Jones challenges is a reasonable and measured determination that, without expert contextualization, his proffered testimony about past events and experiences would not assist the jury in determining his specific intent during an incident that occurred years later. This fact-specific ruling appropriately served valid rules of evidence and was not disproportionate to the purposes served by those rules. It was thus not unconstitutional.

IV.

For the foregoing reasons, we reverse the judgment of the district court and remand for consideration of Jones's remaining claims.

**REVERSED AND REMANDED.**